(No. 61637.—

*In re* JAMES FRANCIS THEBEAU, JR., Attorney, Respondent.

*Opinion filed February 6, 1986.*

Daniel Drake, of Springfield, for the Administrator of the Attorney Registration and Disciplinary Commission.

Benjamin B. Allen, of Alton, for respondent.

JUSTICE WARD delivered the opinion of the court:

The respondent, James Francis Thebeau, Jr., was admitted to the bar of Illinois in October 1966. After military service he began the practice of law in January 1969 and since August 1971 has been a sole practitioner.

The Administrator of the Attorney Registration and Disciplinary Commission filed a complaint on January 31, 1984, against the respondent alleging the practice of fraud and deceit upon the court in the probating of an estate and other violations of the Code of Professional

Responsibility. A panel of the Hearing Board found violations as the complaint charged and recommended that the respondent be suspended from the practice of law for one year and until further order of court. Neither the respondent nor the Administrator filed exceptions, and the cause was submitted to this court as an agreed matter pursuant to our Rule 753(e)(1) (94 Ill. 2d R. 753(e)(1)). Under the rule we referred the cause to the Review Board of the Commission for its consideration. The respondent then filed exceptions before the Review Board, complaining that a one-year suspension would be excessive. In March 1985, the Review Board filed a report adopting the Hearing Board's findings and recommending suspension from practice for two years. The Review Board did not recommend that the suspension be until further order of this court.

Mildred Crider died on May 24, 1981. The respondent was retained to probate her estate by Joseph, Don and Alan Crider, three of her sons, who were residuary beneficiaries under the will. The principal and only substantial asset of the estate was a house in Granite City, Illinois, worth approximately $25,000. Mildred Crider's will had been drawn by the respondent, and it provided for a $5,000 trust fund for each of her five minor grandchildren, who were the children of Don and Joseph Crider. The will contained a power-of-sale clause which gave authority to the executor to sell property without necessity of judicial approval. When the respondent was retained the three brothers agreed that Alan would serve as the executor and as the trustee of the grandchildren's trust funds. They also agreed that Alan would purchase the house for $25,000, which would be used to fund the trusts for the grandchildren. Alan later told the respondent that he was then financially unable to purchase the house and that Joseph and Don had agreed to a sale by installment payments. The respondent did not advise

against an installment sale; rather he told Alan that a contract calling for sale in a single payment should be drawn. The respondent believed that if the court learned there was an installment sale the estate could not be closed for a number of years. The respondent prepared a contract naming the three brothers as sellers and Alan as executor as well and also naming Alan as the purchaser. Alan returned the contract to the respondent bearing the signatures of the other two brothers. Alan then signed in the presence of the respondent, and acting as a notary public the respondent acknowledged all three signatures though he had seen only Alan sign the contract. Although the will authorized sale by the executor without judicial approval, the attorney filed a petition for the sale of real estate in the circuit court of Madison County and attached to it a copy of what purported to be the contract to sell. He did not disclose to the court that the parties had agreed that the sale would be an installment sale, contrary to the terms stated in the contract. The court entered an order of sale, and an executor's deed was prepared conveying the house from Alan as the executor to himself individually.

Alan later advised the respondent that the title insurance company would not issue a title guaranty policy unless the three brothers and a fourth brother, Robert, executed quitclaim deeds. Though the respondent considered that Alan as executor had full authority to convey, he prepared quitclaim deeds. When Alan asked if he could sign his brothers' names to the deeds the respondent consented to Alan's signing their names to the quitclaim deeds. He, as a notary, acknowledged all of the signatures as being affixed in his presence, and the deeds were recorded by him.

Joseph Crider later inquired about his mother's estate and told respondent that Alan was having remodeling work done on his home and was concerned as to the

source of funds for the remodeling. He expressed surprise when the respondent showed him a copy of the sales contract signed by the brothers. He told the respondent that Alan represented the document to him as an unimportant matter involving the estate and that he had not read it but had simply signed the document. The respondent learned later that Alan had secured the quitclaim deeds in order to avoid any question regarding title and had obtained a mortgage loan. A bitter dispute between Alan and his brothers ensued. Alan did not immediately apply the mortgage proceeds in favor of the trust funds of the grandchildren. They were not fully funded for a year, and there was a consequent loss of a year's interest.

As the hearing panel noted in its report, the respondent did not present any mitigating facts and circumstances and did not present character or reputation testimony. The respondent admitted all of the facts on which the decision of the Hearing Board was founded, fully acknowledged his fault, and expressed contrition. At the time he was retained he had anticipated there would be a total fee of not more than $500. He did not receive any fee and testified that he was undeserving of a fee. He did not seek reimbursement for certain costs.

The only explanation given by the respondent for his conduct was that he was desirous of concluding the probate of the estate as soon as possible and with a minimum amount of costs. He intended thereby to benefit the grandchildren.

He contends that the sanctions recommended by both the Hearing Board and by the Review Board are under the circumstances overly severe. He says that appropriate consideration was not given to the absence of any dishonest motive in his conduct; to his honest acknowledgment of what he had done and his cooperation in the disciplinary proceedings; and to his prior unblemished

record as a lawyer.

These are factors which surely should be considered in determining what sanction should be imposed upon an attorney for unethical conduct, and we do consider them. We cannot ignore the fact that the fraud here was professionally outrageous. While the fraud was atypical in the sense that it was not done for personal gain, in a real sense it was fraud of a more aggravated character than found in fraud for monetary gain. It was fraud practiced upon the judicial system. This was not a single, quick and unreasoned failure of judgment, but rather was a deliberate course of conduct. The conduct was described in the report of the hearing panel, which recommended a one-year suspension:

> "Respondent's actions in taking acknowledgments of signatures he did not see, of misrepresenting facts to the Circuit Court, of knowingly permitting forgeries and then taking the acknowledgments of the forged signatures and recording the instruments so forged are completely illegal actions."

The Review Board in recommending a longer suspension observed:

> "Respondent's conduct is far more onerous than commingling or converting client's funds, despite the fact Respondent was not motivated by personal gain or venality and we therefore believe the sanction should be more severe."

We consider suspension from the practice of law for a period of two years would be an appropriate sanction. The respondent states without contradiction, however, that because of the events described here, he closed his office in August 1984 and has not engaged in practice since that time. In view of this we judge that the respondent's suspension from practice should be for a period of one year from the date of the filing of this opinion.

*Respondent suspended.*